In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-09-00052-CV


NO. 09-09-00127-CV


____________________



PATRICK W. MURRAY, JR., Appellant



V.



EPIC ENERGY RESOURCES, INC., Appellee



and



IN RE PATRICK W. MURRAY, JR.


 




On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 08-12-11975-CV 


and


Original Proceeding






OPINION 



 Appellant Patrick W. Murray, Jr. filed an interlocutory appeal from the trial court's
orders denying his special appearance, temporarily enjoining him, denying his motion to
compel arbitration, and abating a pending arbitration between Murray and his former
employer, appellee Epic Energy Resources, Inc. ("Epic"). Murray also filed a petition for
writ of mandamus, in which he also argues that the trial court abused its discretion by
denying his motion to compel arbitration, by abating the pending arbitration, and "not
ordering the parties[] to arbitrate the issues which clearly fall within the arbitration
provision." We affirm the trial court's order denying Murray's special appearance, reverse
the trial court's temporary injunction order, and deny the petition for writ of mandamus.

Background


 Murray entered into an employment agreement with Epic (1), a company located in The
Woodlands, Texas. (2) The agreement provided that Epic could terminate Murray immediately
for good cause, "without any further liability to" Murray. According to the terms of the
agreement, if Epic terminated Murray's employment without good cause, Murray would
receive severance pay from Epic.

 The agreement also stated that Epic would provide confidential information, and
Murray agreed that both during and after his employment with Epic, he would "not directly
or indirectly disclose any [c]onfidential [i]nformation[.]" The agreement expansively
defined "[c]onfidential [i]nformation" as:

 information pertaining to, but not limited to: customer lists, bid policies and
practices, pricing information, financial and other data, contract information,
employee lists, manuals, documentation, forms, contracts, agreements,
literature, sources of supply, specifications, techniques, engineering, training
methods, procedures, systems, data, computer software programs, source
codes, hardware development, plans, processes, inventions, discoveries,
proprietary technology, methods, trademarks, trade secrets, know-how,
corporate books and records, other information concerning [Epic's] business
or assets or financial condition and evaluations and use or non-use of other
technical or business information not in the public domain and research
projects and customer-specific information disclosed to [Murray] by [Epic]
which is not generally known to the public.


In addition, the agreement contained a non-competition provision, which provided as
follows, in pertinent part:

 [Murray] acknowledges and agrees that as an employee and representative of
[Epic], [Murray] will be responsible for building and maintaining business
relationships and goodwill with current and future customers, clients, and
prospects on a personal level. . . .


 . . . .


 In consideration for the valuable consideration described above, [Murray]
acknowledges and agrees that for a period commencing upon [his] termination
of employment from [Epic] for any reason, and ending on the earlier of: (I)
twenty-four (24) months following the termination of this Agreement; (ii) the
expiration of the Initial Term . . . or (iii) the expiration of the then-current
Renewal Term . . . (hereinafter, the "Lock Out Period"), [Murray] will not
solicit with any person, company, or business that was or is a client, Customer,
or prospect of [Epic] ("Restricted Customer"). A person or entity is
considered to be a Restricted Customer if [Epic] has taken steps with the direct
objective of obtaining business specifically from such person or entity after 
[Epic] has made a formal proposal or presentation to such person or entity,
which may, but need not, include negotiations with such person or entity.
[Murray] further acknowledges and agrees that during the Lock Out Period,
[he] will not engage in the Same or a Similar Business as [Epic], including
working for any company or business as an agent, consultant, partner,
employee, officer, shareholder or independent contractor (but excluding any
client or Customer of [Epic]), in the Market Area . . . .


 In addition, the agreement contained a provision which required that "[a]ny claim or
controversy arising out of or relating to this Agreement, or any breach of this Agreement,
shall be settled by final and binding arbitration in Montgomery County, Texas[.]" However,
the agreement also specified that "nothing in this Agreement shall be construed to require the
arbitration of any claim arising out of or relating to the Non-Disclosure, Non-Competition
or Non-Interference provisions set forth in this Agreement. These provisions shall be
enforceable by any Court of competent jurisdiction and shall not be subject to arbitration
under this section." Moreover, the agreement contained a choice of law provision, which
stated, "[t]he parties acknowledge and agree that the law of Texas will govern the validity,
interpretation, and effect of this Agreement and dispute[s] relating to, or arising out of, the
employment relationship between [Epic] and [Murray]."

 On May 27, 2008, Epic terminated Murray for cause, and on July 24, 2008, Murray
filed a demand for arbitration. (3) In his demand for arbitration, Murray asserted that Epic had
provided no legitimate basis for his "for cause" termination, and he sought severance
benefits. The case was scheduled for arbitration on January 5, 2009. However, on December
30, 2008, Epic filed a lawsuit against Murray in Montgomery County, Texas. In its lawsuit,
Epic asserted claims against Murray for breach of the non-disclosure and non-competition
provisions of the employment agreement, as well as misappropriation of trade secrets, breach
of fiduciary duty, and tortious interference with existing and prospective contracts. Epic also
sought a temporary restraining order and a temporary injunction.

 Murray filed a special appearance, in which he asserted that he was a resident of
Colorado and that the District Court in Montgomery County, Texas lacked personal
jurisdiction over him. In support of his special appearance, Murray attached his affidavit,
in which he averred, among other things, that he has never worked in Texas; Epic is a
Colorado corporation; he signed the employment agreement outside Texas; he worked for
Pearl only in Colorado; his paychecks were made from Pearl accounts located outside Texas; 
and his employment benefits were administered from offices in Colorado. Murray also
averred in the affidavit that during his employment, he traveled to Texas to meet with clients
or for management meetings on four occasions. Murray maintained that it would be unduly
burdensome for him to litigate in Texas.

 Epic filed a response to Murray's special appearance, in which it argued that the trial
court could exercise both general and specific jurisdiction over Murray. Epic also argued
that Murray had "waived his Special Appearance by initiating arbitration proceedings in
Montgomery County." Epic contended that the trial court had specific jurisdiction over
Murray because Murray did the following: negotiated the terms of his employment with
Epic's representatives in Texas; entered into an employment agreement with a Texas
resident; agreed that Texas law governs the Agreement; traveled to Texas several times
during his seven months of employment with Epic; regularly reported to and worked under
the direction of Epic's CEO and President, both of whom worked in Epic's main office in
Texas; and demanded arbitration in Texas. In addition, Epic asserted that Murray's contacts
with Texas were frequent, substantial, and "knowingly directed at and accomplished with a
Texas resident corporation for the purpose of Murray obtaining and maintaining employment
and/or benefits under the Agreement and the laws of the State of Texas." Epic also
contended that Murray was subject to the general jurisdiction of Texas.

 As support for its response, Epic provided the affidavit of Rex Doyle, the CEO of
Epic. Doyle averred that since Epic's inception, Epic had maintained its principal place of
business in Texas. Doyle also averred that before and during Murray's employment, he was
in contact with Murray multiple times per day, and that he contacted Murray an average of
ten to fifteen times per week. In addition, Doyle averred that Murray reported to him during
Murray's employment with Epic. Epic also attached to its response the affidavit of John
Ippolito, the President of Epic. Ippolito averred in his affidavit that during Murray's
employment with Epic, Ippolito contacted Murray approximately once per workday. Ippolito
also stated that Murray regularly participated in Epic's management meetings and conference
calls, and that Murray was responsible for preparing and providing regular reports to both
Ippolito and Doyle.

 The trial court denied Murray's special appearance and retained the case on its docket. 
The trial court's order did not state the basis for its ruling, and the trial court did not file
findings of fact and conclusions of law. At the subsequent evidentiary hearing on Epic's
request for a temporary injunction, Ippolito testified that Epic acquired Pearl, a Colorado
engineering company, in December of 2007. Ippolito signed Epic's employment agreement
with Murray. According to Ippolito, before the parties executed the employment agreement,
they negotiated about various aspects of the agreement for "a number of weeks[.]" Ippolito
explained that some of the negotiation pertained to the non-competition and non-disclosure
provisions, and he opined that a violation of the non-competition agreement could diminish
Epic's effectiveness in the marketplace and hinder its success in developing additional
business. Ippolito testified that Epic's billings from Pearl had significantly decreased
between the third and fourth quarters of 2008. The trial court admitted into evidence a
statement of Epic's billings, as well as a spreadsheet of Epic's billable hours.

 Ippolito testified that during Murray's employment with Epic, Ippolito had contact
with Murray almost daily by telephone or e-mail. According to Ippolito, Murray was
responsible for the profits and losses of Pearl, and he was responsible for Pearl's business
development, which consisted of contacting clients, putting proposals together, and following
up with clients "prior, during, or after projects were executed or completed." Ippolito
explained that Murray was also responsible for soliciting new business and expanding
business with current clients. Ippolito testified that during Murray's employment with Epic,
Murray had access to confidential information, including customer lists, pricing information,
financial data, and contract information. When asked whether "there's any way Mr. Murray
could work with drop-off without either directly or indirectly disclosing [confidential]
information," Ippolito responded that Murray could not do so. Ippolito also testified that he
believed it was impossible for Murray's employment with EnCana not to violate the non-competition provisions of the agreement.

 Ippolito testified that while Murray was employed with Epic, Pearl provided
engineering and construction management services to EnCana, and Pearl had planned to
"leverage and expand" its business with EnCana. According to Ippolito, Pearl's business
with EnCana has contracted "a lot" since Murray's employment with EnCana, and Ippolito
opined that Murray was influencing EnCana because of Murray's dissatisfaction about his
termination. On cross-examination, Ippolito admitted that the decline in business from
EnCana could have been attributable to a downturn in the energy market. Ippolito testified
that Murray returned all of the confidential information in his possession within the time
period specified in the agreement, and Ippolito explained that such information becomes
dated, so it becomes less important with the passage of time.

 At the conclusion of the hearing, the trial court granted Epic's request for a temporary
injunction. The trial judge stated, 

 As far as abating the arbitration, I'm not a fan of arbitration. Our Supreme
Court is not a fan of arbitration. If the Supreme Court gets their way in this
legislative session, I'll never have to send a case to arbitration again. And I'm
not going to do it right now. But it's abated, and I'm not changing my opinion
about that. This litigation is more important. This litigation will go forward[.] 


In its order granting Epic's request for temporary injunction, the trial court found that Epic
had a valid claim against Murray, that there was evidence of imminent harm to Epic, and that
"if the Court does not issue the temporary injunction order, the arbitration may cause
irreparable injury to [Epic] if the arbitration is concluded before this case." The trial court
also found that Murray possessed information that was confidential and proprietary to Epic,
that Murray might injure Epic by disclosing or utilizing the information to Epic's detriment
and in violation of the parties' agreement, and that Epic had "no other adequate remedy at
law because the harm to [Epic] cannot be accurately calculated in monetary damages."

 The trial court's order prohibited Murray from interfering with Epic's 

 business operations or EPIC's affiliates' business operations in any way,
including breaching the terms of the non-disclosure, non-competition and non-interference provisions of the Employment Agreement between the 
parties . . ., and from communicating directly or indirectly with EPIC, EPIC's
employees, agents or representatives outside the presence of the EPIC's
counsel.


The order also prohibited Murray from utilizing, divulging, or disseminating Epic's
confidential information; "[c]ontacting, soliciting[,] or working for any person, company[,]
or business that was or is a client, customer[,] or prospect of . . . EPIC o[r] EPIC's affiliate,
except that Murray may continue his present employment with EnCana Oil and Gas until and
unless this Court orders otherwise in the future[;]" or engaging in the same or similar
business as Epic or its affiliates within the same market area. Furthermore, the court found
that the issues before it were not subject to arbitration, abated the pending arbitration
proceedings between Murray and Epic, and found that because the facts and issues in the
arbitration and the litigation were interrelated, the arbitration issues could not reasonably be
evaluated and decided until the litigation was resolved, and allowing the arbitration to
continue "would render an unjust, inefficient[,] and unappealable result." Murray then filed
an interlocutory appeal, as well as a petition for writ of mandamus. See Tex. Civ. Prac. &
Rem. Code Ann. § 51.014(a)(4), (7) (Vernon 2008) (providing for interlocutory appeal of
the trial court's denial of special appearance and for granting of a temporary injunction). 
Because the issues raised in the mandamus proceeding and the interlocutory appeal are
interrelated, we consider them together.

Issue One


 In his first issue in the interlocutory appeal, Murray contends the trial court erred by
denying his special appearance. "Because the question of a court's exercise of personal
jurisdiction over a nonresident defendant is one of law, we review a trial court's
determination of a special appearance de novo." Moki Mac River Expeditions v. Drugg, 221
S.W.3d 569, 574 (Tex. 2007) (citation omitted). When, as here, the trial court does not file
findings of fact and conclusions of law, we infer all facts necessary to support the judgment
and supported by the evidence. Id. (citing BMC Software Belgium, N.V. v. Marchand, 83
S.W.3d 789, 795 (Tex. 2002)).

 A nonresident defendant who files a special appearance bears the burden of negating
all of the bases of personal jurisdiction the plaintiff has alleged. Am. Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 807 (Tex. 2002). Texas courts may exercise in
personam jurisdiction over a nonresident defendant if (1) the Texas long-arm statute
authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports with
federal and state constitutional due-process guarantees. Moki Mac, 221 S.W.3d at 574 (citing
Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990)); see also Tex. Civ. Prac. & Rem.
Code Ann. § 17.042 (Vernon 2008) (long-arm statute). Under our long-arm statute, a
nonresident defendant does business in Texas if it "contracts by mail or otherwise with a
Texas resident and either party is to perform the contract in whole or in part in this state[.]" 
Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1). "[T]he long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements
of due process will allow.'" Moki Mac, 221 S.W.3d at 575 (quoting Guardian Royal Exch.
Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991)); see also
Am. Type Culture Collection, 83 S.W.3d at 806. A state may exercise personal jurisdiction
over a nonresident defendant if the defendant has established minimum contacts with the
forum state, and the exercise of jurisdiction comports with traditional notions of fair play and
substantial justice. Moki Mac, 221 S.W.3d at 575 (citation omitted). A nonresident
defendant's "contacts with the forum state may give rise to either general or specific
jurisdiction." Langston, Sweet & Freese, P.A. v. Ernster, 255 S.W.3d 402, 407 (Tex. App.--Beaumont 2008, pet. denied) (citing BMC Software, 83 S.W.3d at 795).

 When a defendant's contacts with the forum state have been continuous and
systematic, general jurisdiction is established. BMC Software, 83 S.W.3d at 796. When the
contacts are not continuous and systematic, specific jurisdiction may be established if the
defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within
the forum." Moki Mac, 221 S.W.3d at 576 (quoting Helicopteros Nacionales de Columbia,
S.A. v. Hall, 466 U.S. 408, 414 n.8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). With respect
to specific jurisdiction, courts focus the minimum-contacts analysis on the relationship
among the defendant, the forum, and the litigation. Id. at 575-76.

 For a Texas court to exercise specific jurisdiction, the nonresident defendant must
have made minimum contacts with Texas by purposefully availing himself of the privilege
of conducting business here, and his liability must have arisen from or be related to those
contacts. Id. at 576. "[T]here must be a substantial connection between those contacts and
the operative facts of the litigation." Id. at 585. A "purposeful availment" inquiry involves
three parts: (1) consideration of the defendant's contacts with the forum, but "not the
unilateral activity of another party or a third person[;]" (2) "the contacts relied upon must be
purposeful rather than random, fortuitous, or attenuated[;]" and (3) the defendant must seek
a benefit, advantage, or profit by availing itself of the jurisdiction. Id. at 575 (citations
omitted). "In contrast, a defendant may purposefully avoid a particular forum by structuring
its transactions in such a way as to neither profit from the forum's laws nor subject itself to
jurisdiction there." Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct.
2174, 85 L.Ed.2d 528 (1985)).

 Because it is dispositive, we address the question of specific jurisdiction. For the
Montgomery County District Court to properly exercise specific jurisdiction over Murray,
Murray must have made minimum contacts with Texas by purposefully availing himself of
the privilege of conducting activities here, and his liability must have arisen from or be
related to his contacts with Texas; that is, there must be a substantial relationship between
Murray's contacts and the operative facts of the litigation. See Moki Mac, 221 S.W.3d at
576, 585.

 We first address Epic's contention that Murray waived his special appearance by
demanding arbitration in Texas. As support for its waiver argument, Epic cites Harbison-Fischer Mfg. Co., Inc. v. Mohawk Data Sciences Corp., 823 S.W.2d 679 (Tex. App.--Fort
Worth 1991), judgment set aside by agr., 840 S.W.2d 383 (Tex. 1992). However, in
Harbison-Fischer, the nonresident defendant, Harbison-Fischer, participated in arbitration
proceedings after suit was filed; therefore, the court held that Harbison-Fischer had entered
"a general appearance in a special proceeding and to have waived any question of
jurisdiction." Id. at 684. Moreover, the Harbison-Fischer court relied on New York law in
reaching its decision. Id. In the case sub judice, Murray filed his demand for arbitration
before Epic filed suit against him; therefore, his pre-suit demand for arbitration did not
constitute an appearance in the suit later filed by Epic.

 Murray entered into a contract for employment with Epic, a corporation that has its
principal place of business in Texas. The agreement provided that Murray was to receive a
salary, bonuses, and various benefits. Pursuant to the terms of the agreement, Murray was
responsible for building and maintaining Epic's business relationships. The contract
expressly provided that Texas law would govern any disputes arising from the agreement,
and a part of the contract, the arbitration provision, expressly contemplated that it would be
performed in Texas.

 Although the choice of law provision alone is not dispositive, it is a significant factor
that supports Murray's deliberate affiliation with Texas and the foreseeability of litigation
in Texas concerning the agreement. See Burger King, 471 U.S. at 482; Michiana Easy Livin'
Country, Inc. v. Holten, 168 S.W.3d 777, 792 (Tex. 2005). In addition, with the exception
of disputes concerning the non-disclosure, non-competition, and non-interference provisions
of the agreement, the agreement provided that disputes must be arbitrated in Montgomery
County, Texas. Murray traveled to Texas on several occasions during his relatively brief
employment with Epic, and he admitted that he made the trips either to meet with clients or
to attend management meetings. In addition, Murray frequently communicated with and
reported to Epic's executives who were based in Texas. Under the circumstances, Murray
established minimum contacts with Texas, and the trial court's exercise of jurisdiction
comports with traditional notions of fair play and substantial justice. See Moki Mac, 221
S.W.3d at 575. In addition, Murray purposefully availed himself of the privilege of
conducting business in Texas, and his alleged liability is related to his contacts with Texas. 
See id. at 576. Murray had contacts with Texas, his contacts were purposeful, and he
received a benefit by availing himself of this jurisdiction. See id. at 575. The trial court did
not err by denying Murray's special appearance. Accordingly, we overrule issue one.

Issue Five


 In his fifth issue, Murray contends, among other things, that the trial court erred by
finding that the pending arbitration proceeding would cause irreparable injury to Epic if it
was concluded before the litigation. An applicant for a temporary injunction must prove (1)
a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a
probable, imminent, and irreparable injury in the interim. Butnaru v. Ford Motor Co., 84
S.W.3d 198, 204 (Tex. 2002). A trial court's order granting a temporary injunction must
state the reasons for its issuance and be specific in its terms. Tex. R. Civ. P. 683. If a
temporary injunction does not comply with the mandatory requirements of Rule 683, it is
void, and the appellate court should dissolve the temporary injunction. Qwest Commc'ns
Corp. v. AT&T Corp., 24 S.W.3d 334, 337 (Tex. 2000); Indep. Cap. Mgmt., L.L.C. v. Collins,
261 S.W.3d 792, 795 (Tex. App.--Dallas 2008, no pet.). Rule 683 requires a trial court to
set out in a temporary injunction order the reasons it believes the applicant will suffer an
imminent and irreparable injury if the court does not grant the injunction. State v. Cook
United, Inc., 464 S.W.2d 105, 106 (Tex. 1971); see also Tex. R. Civ. P. 683. The trial
court's reasons must be specific and legally sufficient, and not mere conclusory statements. 
Charter Med. Corp. v. Miller, 547 S.W.2d 77, 78 (Tex. Civ. App.--Dallas 1977, no writ).

 We review an order granting a temporary injunction for abuse of discretion. Butnaru,
84 S.W.3d at 204. As a reviewing court, we will not substitute our judgment for that of the
trial court unless the trial court's action was so arbitrary that it exceeded the bounds of
reasonable discretion. Id. The trial court abuses its discretion if its decision is not supported
by substantial and probative evidence. Envoy Med. Sys., L.L.C. v. State, 108 S.W.3d 333,
335 (Tex. App.--Austin 2003, no pet.). In addition, "[a] trial court abuses its discretion by
issuing a temporary injunction order that does not comply with the requirements of [R]ule
683." Collins, 261 S.W.3d at 795 (citation omitted).

 In this case, the trial court found in its temporary injunction order that Epic would
suffer imminent, irreparable harm if the arbitration concluded before the litigation; however, 
the arbitration involved only the issue of whether Epic lacked a basis for its "for cause"
termination and, as a result, owed severance benefits to Murray. The various claims Epic
asserted against Murray in its lawsuit all stem from Murray's alleged violations of the
agreement after Epic terminated his employment. The evidence adduced at the temporary
injunction hearing does not support the trial court's conclusion that Epic would be harmed
if the issue raised by Murray in the arbitration proceeding was determined before the
litigation concluded. See Envoy Med. Sys., 108 S.W.3d at 335. In addition, the language in
the temporary injunction regarding irreparable harm is not sufficiently specific to comply
with Rule 683. See Tex. R. Civ. P. 683; see also Charter Med. Corp., 547 S.W.2d at 78. 
Therefore, we reverse the trial court's temporary injunction order and dissolve the temporary
injunction. Because the trial court also stayed the arbitration in its temporary injunction
order, which we have dissolved, we need not address Murray's remaining issues, and
Murray's petition for writ of mandamus is moot.

 AFFIRMED IN PART; REVERSED IN PART; PETITION FOR WRIT OF
MANDAMUS DENIED.

 

 STEVE McKEITHEN

 Chief Justice

 

Submitted on May 28, 2009

Opinion Delivered November 5, 2009

Before McKeithen, C.J., Kreger and Horton, JJ.





CONCURRING AND DISSENTING OPINION



Because I would find no specific jurisdiction, I respectfully dissent in part and concur
in part to the majority's opinion. For a Texas court to exercise specific jurisdiction, (1) the
nonresident defendant must have made minimum contacts with Texas by purposefully
availing himself of the privilege of conducting business here, and (2) the nonresident
defendant's liability must have arisen from or be related to those contacts. Moki Mac River
Expeditions v. Drugg, 221 S.W.3d 569, 576 (Tex. 2007). In Moki Mac, the Texas Supreme
Court addressed the extent to which a claim must "arise from or relate to" the nonresident's
forum contacts to confer specific jurisdiction. The Court concluded that "for a nonresident
defendant's forum contacts to support an exercise of specific jurisdiction, there must be a
substantial connection between those contacts and the operative facts of the litigation." Id.
at 585. This analysis focuses on the relationship among the nonresident, the forum, and the
litigation. Pelican State Physical Therapy, L.P. v. Bratton, No. 01-06-00199-CV, 2007 WL
2833303, at *6 (Tex. App.--Houston [1st Dist.] Sept. 27, 2007, no pet.) (mem. op.) (citing
Counter Intelligence, Inc. v. Calypso Waterjet Sys., Inc., 216 S.W.3d 512, 517 (Tex. App.--Dallas 2007, pet. denied)). Specifically, the allegedly wrongful conduct must have been
purposefully directed at or have occurred in the forum and must have "a 'substantial
connection,' resulting in the alleged injuries," to the operative facts of the litigation. Id.
(citing Moki Mac, 221 S.W.3d at 584). Several Texas cases have found the "arises from or
is related to" prong of the specific jurisdiction analysis unsatisfied when the nonresident
defendant's conduct that allegedly resulted in liability did not relate to the defendant's
contacts with the forum state. See Gonzalez v. AAG Las Vegas, L.L.C., No. 01-08-0037-CV,
2009 WL 1562934, at *5 (Tex. App.--Houston [1st Dist.] June 4, 2009, no pet. h.) (reversing
trial court's order denying special appearance where, given the pleadings, the operative facts
regarding appellee's alleged breach of loyalty and usurpation claims concern defendant's acts
while working in Las Vegas, Nevada, not Texas); Pelican, 2007 WL 2833303, at *8 (noting
that the trial court properly concluded it could not exercise personal jurisdiction where the
operative facts related to acts that occurred outside the forum state); Counter Intelligence,
Inc., 216 S.W.3d at 520 (noting the trial court erred in concluding that Texas could exercise
specific jurisdiction over defendant where the alleged breach of contract arose out of Counter
Intelligence's conduct in Pennsylvania and Maryland, not Texas); Gustafson v. Provider
Healthnet Servs., Inc., 118 S.W.3d 479, 484 (Tex. App.--Dallas 2003, no pet.) (noting that
none of the contacts relied upon to establish specific jurisdiction were related to defendant's
execution of the confidentiality agreement or his dissemination of confidential information,
both of which occurred in Michigan, not Texas); Lang v. Capital Res. Invs., I & II, LLC, 102
S.W.3d 861, 866 (Tex. App.--Dallas 2003, no pet.) (holding no specific jurisdiction where
alleged tortious conduct was not related to defendant's contacts with Texas).

Likewise, here Murray's contacts are insufficient to confer specific jurisdiction
because the acts alleged to create liability do not arise out of and are not related to Murray's
contacts with Texas. The facts alleged in support of Epic's claims for breach of contract,
trade secrets misappropriation, breach of fiduciary duty, and tortious interference with
existing contracts all relate to conduct that allegedly took place in Colorado. 

In its petition, Epic alleges that Murray breached his employment agreement by
violating the non-disclosure and non-competition provisions. Specifically, Epic alleges that
Murray testified at his deposition that he was working as a consultant for EnCana Oil and
Gas and thus, breached his employment agreement with Epic by disclosing confidential
information obtained by Murray while working at Epic. Epic further alleges that Murray
misappropriated trade secrets by using and disclosing confidential, proprietary, and trade-secret information to EnCana. Murray averred that he was working in EnCana's Denver,
Colorado offices. Epic does not allege that any of the confidential, proprietary or trade-secret
information was either obtained by Murray in Texas or disclosed by Murray in Texas.

Epic further alleges that Murray breached his fiduciary duties to Epic by engaging in
self dealing; failing to treat employees equally; usurping corporate opportunities; and failing
to act with integrity, good faith, loyalty, and honesty during his employment with Epic. 
None of the facts alleged in support of these allegations arise out of or are related to
Murray's alleged contacts with Texas. Rather, the allegations made in support of these
claims relate to actions by Murray while working in Colorado. Epic further alleges that
Murray tortiously interfered with Epic's existing and prospective contracts with EnCana. 
Murray, however, was employed by EnCana in its Colorado office.

The United States Supreme Court's holding in Burger King Corp. v. Rudzewicz, 471
U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), is distinguishable from the present case. 
In Burger King, the franchise agreement required partial performance in the forum state;
specifically, the franchisee's payments under the contract were required to be made at Burger
King's place of business in Florida. Id. at 466, 468. Failure to make the required payments
formed a part of the basis of Burger King's suit against the franchisee. Id. at 468. Therefore,
the alleged breach of the agreement occurred, at least in part, in Florida. As noted by the
Pelican court, the nonresident defendant in Burger King was sued for some of the same
contractual obligations that constituted, or were closely related, to his asserted contacts with
Florida. Pelican, 2007 WL 2833303, at *9. Here, in contrast, the specific contractual
obligations that Epic argues constitute Murray's contacts with Texas were not those that
Murray was alleged to have breached and the tortious acts that Epic alleges Murray
committed were alleged to have been committed in Colorado.

"When an employee lives and works outside of Texas, employment 'by a company
with its principal place of business in Texas is not sufficient to establish the requisite
minimum contacts with Texas.'" Rushmore Inv. Advisors, Inc. v. Frey, 231 S.W.3d 524, 530
(Tex. App.--Dallas 2007, no pet.) (quoting Gustafson, 118 S.W.3d at 483). After reviewing
Murray's contacts as a whole in light of the claims alleged, I would conclude Murray's
contacts with Texas are not sufficient to establish specific jurisdiction. See generally Moki
Mac, 221 S.W.3d at 585, 588; Gonzalez, 2009 WL 1562934, at **5-6; Pelican, 2007 WL
2833303, at **8-9; Gustafson, 118 S.W.3d at 483-84. None of the contacts relied upon by
Epic to establish jurisdiction are connected to Murray's alleged breach of contract,
misappropriation of trade secrets, breach of fiduciary duty, or interference with existing or
prospective contracts, all of which occurred if at all, in Colorado. Instead, the contacts Epic
relies on "relate only superficially to [Murray's] general employment relationship" with Epic. 
See Gustafson, 118 S.W.3d at 484. 

I disagree with the majority's opinion that a choice of forum in an arbitration
provision in a contract indicates that the contract is performable in part in the state of the
selected forum and should be considered a factor when determining jurisdiction. The very
purpose of an arbitration provision is to prevent subjecting the parties to litigation in the
event of a dispute. See Cayan v. Cayan, 38 S.W.3d 161, 166 (Tex. App.--Houston [14th
Dist.] 2000, pet. denied) ("[T]he purpose of alternative dispute measure is to keep parties out
of the courtroom."); see also Werline v. E. Tex. Salt Water Disposal Co., 209 S.W.3d 888,
896 (Tex. App.--Texarkana 2006, pet. granted) ("The purpose of arbitration is to avoid the
formalities, delay, and expense of ordinary litigation."). 

I would conclude the trial court did not have specific jurisdiction over Murray and
should have granted his special appearance. I would vacate the trial court's order granting
the temporary injunction for lack of jurisdiction and dissolve the trial court's order abating
the arbitration for that reason. However, I agree with the majority's holding that the
evidence adduced at the temporary injunction hearing does not support the trial court's
conclusion that Epic would be harmed if the issue raised by Murray in the arbitration
proceeding was determined before the litigation concluded and concur in that part of the
majority's opinion that dissolves the temporary injunction.


 ________________________________

 CHARLES KREGER

 Justice


Dissent Delivered

November 5, 2009


1. Before the parties executed the employment agreement, Murray was an employee
of Pearl Development Company ("Pearl"), a Colorado company with its principal office in
Colorado. Epic acquired Pearl in 2007, and Pearl became a wholly-owned subsidiary of
Epic. As part of its acquisition of Pearl, Epic asked certain Pearl employees, including
Murray, to execute employment agreements with Epic.
2. The parties agree that Epic is a Colorado corporation with its principal place of
business in Texas.
3. Murray subsequently began working for EnCana, a client of Epic.